UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| FOAM SUPPLIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:05CV1772 CDP |
| | ) | |
| THE DOW CHEMICAL | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Foam Supplies, Inc. (FSI) brought an eight-count complaint against the Dow

Chemical Company arising out of Dow's alleged manipulation of the price and

supply of two chemicals, methyl diphenyl diisocyanate (MDI) and polyols, used in

polyurethane foam systems. FSI seeks injunctive relief as well as damages for

violations of federal antitrust laws, breach of contract, tortious interference with

business expectancy, and fraud. Additionally, FSI seeks to recover for Dow's

alleged misappropriation of FSI's trade secrets concerning a polyurethane blowing

agent.

Dow now moves to dismiss FSI's entire complaint pursuant to Rule 12(b)(6),

Fed. R. Civ. P. After thoroughly reviewing the complaint and the parties' briefs, I

will grant Dow's motion as to FSI's claims of breach of oral contract (Count IV),

fraudulent misappropriation of trade secrets (Count VII), and unjust enrichment (Count VIII). Because FSI has adequately stated a claim upon which relief can be granted as to the remaining claims, I will deny Dow's motion to dismiss FSI's claims of monopolization (Count I), attempted monopolization (Count II), breach of written contract (Count III), tortious interference (Count V), and fraudulent misrepresentation (Count VI).

## Background

### A.  MDI and Polyols

The following facts are based on the allegations of FSI's complaint, which I must assume are true for purposes of a motion to dismiss. Dow manufactures chemicals including MDI and polyols. FSI, acting as a "systems house," purchases MDI and polyols from Dow for resale and for manufacturing polyurethane foam systems. FSI also uses the MDI and polyols it purchases from Dow to manufacture new compounds and agents. Dow competes with FSI and other independent systems houses in the polyurethane foam market through its subsidiary, North American Systems House.

Dow supplied FSI with MDI and polyols in accordance with several long-term contracts the parties had executed. In 2004, Dow raised the price it charged FSI for MDI on four separate occasions. Additionally, on August 10, 2004, Dow

notified FSI of another price increase as well as a supply restriction that would limit Dow customers to 1/12th of their usual volume. The complaint alleges that in response to the fluctuating prices and supplies, FSI and Dow "reaffirmed [their] contract" on August 16, 2004 for FSI to purchase 10,000,000 pounds of MDI and 2,000,000 pounds of polyols in each of calendar year 2004 and 2005.

FSI alleges that Dow failed to honor its contractual commitments from September through December, 2004. At first, Dow blamed the delay in its shipments on weather conditions and limited supplies of MDI. On November 17, 2004, Dow sent FSI a letter informing FSI that an equipment failure at Dow's MDI plant in Texas would cause additional product shortages. Dow claimed that the alleged "force majeure" excused its performance under the contract.

During this same time period, FSI alleges, Dow actively sought new customers for its MDI and polyols, including customers of FSI. Dow informed these potential customers that they could avoid the ongoing product shortages if they purchased MDI and polyols directly from Dow. Additionally, Dow discouraged these potential customers from purchasing chemicals like MDI from systems houses like FSI, stating that systems houses would be the last to be supplied with chemicals when Dow's stocks were low.

FSI alleges that in response to Dow's repeated failure to supply the agreed

upon amounts of MDI and polyols, representatives of Dow and FSI met in January, 2005 to renegotiate the terms of their agreement. At this meeting, Dow orally promised to supply certain minimum amounts of MDI to FSI in 2005. Dow subsequently failed to provide the agreed upon quantities of MDI. As a result of Dow's failure to supply FSI with MDI and polyols, FSI has lost customers and sales volume.

## B.  Trade Secrets

FSI possesses technology and trade secrets concerning the design and production of a proprietary blowing agent used in the production of polyurethane foam. In late 2003, FSI and Dow entered into negotiations over a potential technology-sharing contract concerning FSI's blowing agent. In the course of these negotiations, FSI and Dow executed a confidentiality agreement. FSI alleges that it relied on Dow's good faith and so permitted Dow to inspect and test FSI's blowing agent trade secrets. The negotiations eventually fell through, and FSI later learned that Dow was using utilizing FSI's trade secrets to create products to compete with FSI, in violation of the parties' confidentiality agreement.

**Discussion**

A defendant may move to dismiss a claim "for failure to state a claim upon which relief can be granted" under Rule 12(b)(6), Fed. R. Civ. P.  The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint.  A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim entitling it to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Young v. City of St. Charles, Missouri, 244 F.3d 623, 627 (8th Cir. 2001).  When considering a motion brought pursuant to Rule 12(b)(6), the factual allegations of a complaint are assumed true and are construed in favor of the plaintiff.  Neitzke v. Williams, 490 U.S. 319, 326 (1989).

A complaint should not be dismissed merely because the court doubts that a plaintiff will be able to prove all the necessary allegations.  Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997).  The issue is not whether the plaintiff will ultimately prevail but whether it is entitled to present evidence to support its claims.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  A court should grant a motion to dismiss only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  Neitzke, 490 U.S. at 327 (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).

## A.    Antitrust Claims

In the first two counts of its complaint, FSI asserts claims of monopolization and attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2. To state a claim for monopolization, a plaintiff must allege (1) possession of monopoly power in the relevant product and geographic market, and (2) willful acquisition or maintenance of that power as distinguished from growth or development as a result of business acumen.  U.S. v. Grinnell Corp., 384 U.S. 563, 570-71 (1966).  To state a claim for attempted monopolization, a plaintiff must allege (1) a specific intent on the part of the defendant; (2) predatory or anticompetitive conduct by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success.  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993).  Further, to have standing to assert a private damages action under federal antitrust laws, a plaintiff must allege that it has suffered an antitrust injury.  Lovett v. General Motors Corp., 975 F.2d 518, 520 (8th Cir. 1992) (citations omitted).

Generally, courts are hesitant to dismiss antitrust actions before the parties have had an opportunity to conduct discovery, as proof of illegal conduct lies largely in the hands of the defendants.  Double D Spotting Service, Inc. v. Supervalu, Inc., 136 F.3d 554, 560 (8th Cir. 1998) (citing Huelsman v. Civic Ctr. Corp., 873 F.2d

1171, 1174 (8th Cir. 1989)). Nevertheless, "[t]he essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal of the complaint on a defendant's Rule 12(b)(6) motion." Id. at 558 (quoting Crane & Shovel Sales Corp. v. Bucyrus-Erie Co., 854 F.2d 802, 805 (6th Cir. 1988)).

Notwithstanding the Eighth Circuit's admonition in Double D, there is no heightened pleading requirement for antitrust claims above that which is required under Fed. R. Civ. P. 8. Twombly v. Bell Atl. Corp., 425 F.3d 99, 108-9 (2d Cir. 2005) ("We have consistently rejected the argument – put forward by successive generations of antitrust lawyers representing clients defending against civil antitrust claims – that antitrust complaints merit a more rigorous pleading standard, whether because of their typical complexity and sometimes amorphous nature, or because of the related extraordinary burdens that litigation beyond the pleading stage may place on defendants and the courts.") (citations omitted); Andrx Pharms. Inc. v. Elan Corp., PLC, 421 F.3d 1227, 1234-35 (11th Cir. 2005) (same); MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc., 62 F.3d 967, 976 (7th Cir. 1995) (noting that judicial attempts to impose a heightened pleading standard in antitrust cases had been "scotched" by the Supreme Court's decision in Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163 (1993)). In sum, when

considering a motion to dismiss antitrust claims, the dispositive issue remains whether the complaint contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

With these standards in mind, I turn to Dow's challenges to the sufficiency of FSI's antitrust allegations. Dow contends that FSI's antitrust claims must fail because FSI has not adequately pled four of the essential elements of a monopolization or attempted monopolization claim: (1) relevant market; (2) monopoly power or dangerous probability of achieving monopoly power; (3) anticompetitive conduct; and (4) antitrust injury.

### 1. Relevant Market

In order to state a claim for monopolization or attempted monopolization under section 2 of the Sherman Act, a plaintiff must identify a valid relevant market. Double D, 136 F.3d at 560 (citations omitted). The relevant market has two components: a product market and a geographic market. Bathke v. Casey's Gen. Stores, Inc., 64 F.3d 340, 345 (8th Cir. 1995). The product market refers to "all reasonably interchangeable products," or goods which exhibit a high cross-elasticity of demand.[1] Double D, 136 F.3d at 560 (citations omitted). The geographic market

---

[1]Cross-elasticity of demand is defined as "[a] relationship between two products, usually substitutes for each other, in which a price change for one product affects the price of the other." Black's Law Dictionary 383 (7th ed. 1999).

refers to "the geographic area in which consumers can practically seek alternative sources of the product." Id. (citations omitted).

"Proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." Federal Trade Commission v. Tenet Health Care Corp., 186 F.3d 1045, 1052 (8th Cir. 1999) (citation omitted). Nevertheless, because there is no "per se prohibition against dismissal of antitrust claims for failure to plead a relevant market," Double D, 136 F.3d at 560 (citation omitted), courts have not hesitated to dismiss antitrust claims where it is clear that the alleged relevant market is too narrow, implausible, defined solely by franchise agreement, or simply not defined anywhere in the pleadings. See Rolite, Inc. v. Wheelbrator Environmental Systems, Inc., 958 F. Supp. 992, 997-99 (E.D. Pa. 1997) (discussing numerous cases).

Dow's challenge to FSI's alleged relevant market in this case marks a noticeable departure from cases in which courts have dismissed antitrust claims for failure to adequately plead relevant market. Dow does not allege that FSI's proposed relevant market – "the market for the chemicals MDI and polyols (the product markets) in North America (the geographic market) (collectively, the 'Systems Markets')" – is too narrow, implausible, or not clearly defined. Instead, Dow contends that FSI's allegations do not contain an adequate explanation for the

proposed market definition. Specifically, Dow argues that FSI's failure to reference the rule of interchangeability and cross-elasticity of demand is fatal to its allegations of relevant market.

While the rule of interchangeability and cross-elasticity of demand are methodologies used by courts to determine relevant market, I agree with FSI that they are not "magic words" that must appear in a complaint to withstand a motion to dismiss. Instead of searching for magic words or phrases, a court must determine whether the complaint alleges sufficient facts to permit the court to reasonably infer that the proposed product market includes all "market alternatives that buyers may readily use for their purposes." U.S. v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 394 (1956). Put another way, at the pleading stage, "it is sufficient that plaintiff has alleged specific facts that support a narrow product market in a way that is plausible and bears a rational relation to the methodology courts prescribe to define a market for antitrust purposes." Todd v. Exxon Corp., 275 F.3d 191, 203 (2d Cir. 2001).

After a thorough review of the pleadings, I find that FSI's allegations, although few, could support FSI's claim that the North American market for MDI and polyols is the appropriate relevant market. My conclusion is guided by several factors. First, on its face, FSI's proposed relevant market does not appear to be

10

defined narrowly merely to increase Dow's market share. FSI has identified the

markets for two generic chemicals, in contrast to the many cases cited by Dow in

which the proposed product market was limited to a single brand, franchise, or

institution. See Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 438

(3d Cir. 1997) (rejecting the plaintiff's attempt to define the relevant market as pizza

supplies approved by Domino's Pizza, Inc. for use by Domino's franchisees as

opposed pizza supplies available from other pizza companies); Commercial Data

Servers, Inc. v. Int'l Business Machines Corp., 166 F.Supp.2d 891, 897 (S.D.N.Y.

2001) (rejecting plaintiff's attempt to define the relevant product market as

mainframe computers compatible with IBM's S/390 operating system); Re-Alco

Industries, Inc. v. Nat'l Center for Health Educ., Inc., 812 F. Supp. 387, 392

(S.D.N.Y. 1993) (dismissing antitrust claims where plaintiff failed to explain why

one particular brand of school health education materials should constitute a market

unto itself, as distinguished from the larger market for all elementary school health

education materials). Additionally, the geographic scope of FSI's proposed relevant

market – all of North America – is broad. Cf. Double D, 136 F.3d at 560-61

(dismissing antitrust claims where alleged geographic market was a single Supervalu

warehouse in a suburb of Des Moines).

Further, FSI's allegations offer a rational explanation as to why the market for

MDI and polyols could be the relevant market in this case. In its complaint, FSI

defines the boundaries of its proposed relevant market in relation to the specific

class of consumers – systems houses – that purchase the chemicals. Additionally,

the complaint explains how MDI and polyols are the raw materials used by systems

houses to manufacture polyurethane foam kits. Thus, by identifying both a specific

customer base and a specific use for the products at issue, FSI has provided a basis

for drawing the relevant market in the way it proposes. See Davies v. Genesis Med.

Ctr., 994 F. Supp. 1078, 1098 (S.D. Iowa 1998) (noting that the boundaries of a

relevant product market may be drawn by analyzing the product's unique

characteristics and uses).

Finally, there is nothing in the record to suggest that the North American

market for MDI and polyols is too narrow or implausible as a matter of law. In

Double D, a semitrailer unloading service brought antitrust claims to challenge an

exclusive unloading contract entered into between a competitor and a supermarket

chain. The relevant market was alleged to include the provision of unloading

services at one Supervalu, Inc. warehouse in Urbandale, Iowa, a suburb of Des

Moines. The Eighth Circuit upheld the district court's dismissal of the antitrust

claims, holding that "as a matter of law, this stated geographic market is too narrow

to support a claim of an antitrust violation." The Court reasoned that "the market

for unloading services would seem to be more properly defined as including all warehouses within, at least, the entire Des Moines, Iowa, metropolitan area, if not an even larger area." 136 F.3d at 560-561.

In Double D, it was readily apparent from the face of the complaint that the alleged relevant market was too narrow as a matter of law. Id. The Court in Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc., 300 F.3d 620, 633 (5th Cir. 2002), similarly balked at a plaintiff's attempt to artificially narrow the relevant market for bottled water in Lubbock, Texas to city-owned and operated facilities, as opposed to all facilities in Lubbock.

In other cases, the party's own allegations permitted the court to conclude that the alleged relevant market did not include all reasonably interchangeable products or services. Davies, 994 F. Supp. at 1098-99 (plaintiffs' attempt to distinguish cardiac anesthesiology services as a distinct product submarket within the general anesthesiology market was contradicted by the plaintiffs' own factual assertions regarding general medical care and anesthesiology services); Caremark, Inc. v. New England Critical Care, Inc., 700 F. Supp. 1033, 1036 (D. Minn. 1988) (defendant's assertion that the relevant market was private home infusion therapy was inconsistent with statements in its own brief that substitute services existed for the provision of intravenous substances).

In contrast to the above cases, it is not clear from the complaint, the parties' briefs, or readily available common knowledge that FSI's alleged relevant market is too narrow or implausible as a matter of law. Indeed, there is nothing in the record that suggests that there are in fact substitutes for MDI or polyols, or that North America is too narrow of a market boundary for these two chemicals. <u>See</u> <u>MCM</u>, 62 F.3d at 976 (declining to entertain the defendant's argument that the alleged relevant market was too narrow where there was nothing in the record to suggest otherwise).

In sum, these factors allow me to reasonably infer that the North American market for MDI and polyols could be the appropriate relevant market in this case. At this stage in the litigation, nothing more is required. <u>See</u> <u>Conley</u>, 355 U.S. at 45-46. Whether FSI's proposed relevant market is the appropriate relevant market, of course, remains a fact-sensitive determination that will be resolved at a later time. <u>See</u> <u>Double D</u>, 136 F.3d at 560 ("[m]ost often, 'proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers.'") (quoting <u>Queen City Pizza, Inc.</u>, 124 F.3d at 436).

## 2.     Monopoly Power

Likewise, Dow's challenge to FSI's allegations related to Dow's monopoly power or dangerous probability of achieving monopoly power must also fail. As

with its challenge to relevant market, Dow attacks FSI's allegations of market power by applying a heightened pleading standard that does not exist for antitrust claims. When the complaint is viewed under the applicable standards, and all allegations are construed in favor of FSI, I find that FSI has adequately pled the elements of monopoly power and dangerous probability of achieving monopoly power.

Allegations concerning a defendant's monopoly power or dangerous probability of achieving monopoly power are essential to a monopolization or attempted monopolization claim under section 2 of the Sherman Act. Grinnell, 384 U.S. at 570-71; Spectrum Sports, Inc., 506 U.S. at 459. The Supreme Court has defined monopoly power as "the power to control prices or exclude competition." E. I. du Pont de Nemours & Co., 351 U.S. at 391. Courts have identified a variety of factors that a plaintiff may allege to demonstrate that a defendant has monopoly power or a dangerous probability of achieving monopoly power to include: market share, the existence of barriers to entry, the nature of the anticompetitive conduct, and whether competitors have the capacity to increase their output in the short run. Barr Laboratories, Inc. v. Abbott Laboratories, 978 F.2d 98, 112 (3d Cir. 1992). While none of these factors is alone dispositive, a plaintiff must allege at least some facts related to these factors in order for a court to reasonably infer that a defendant

possesses the requisite market power to succeed on a claim under Section 2 of the

Sherman Act.  See Triple 7, Inc. v. Intervet, Inc., 338 F.Supp.2d 1082, 1086 (D.

Neb. 2004) ("Plaintiff's failure to allege any facts that show its market power or

market share is fatal to its Section 2 claim."); Brunson Communications, Inc. v.

Arbitron, Inc., 239 F.Supp.2d 550, 569 (E.D. Pa. 2002) ("[T]he failure to allege a

substantial market share is not itself fatal to Plaintiff's monopolization claim.

Rather, this Court may consider other factors tending to show monopoly power,

apart from market share.").

In its complaint, FSI alleges that Dow has obtained monopoly power, or in

the alternative, has a substantial market share in the North American markets of

both MDI and polyols "by virtue of its manufacturing capacity, sales volume,

leadership in setting prices, along with other factors."  Admittedly, these allegations

alone are not particularly illuminating.  FSI has not alleged what Dow's market

share actually is, or whether other providers of MDI and polyols exist in North

America.  Nevertheless, these omissions are not fatal to FSI's claims.  See Rolite,

958 F. Supp. at 1001 (concluding that the plaintiff had adequately pled monopoly

power despite failing to identify the defendants' market share or what other firms, if

any, compete in the relevant market).

When viewed as a whole, I find that FSI's complaint presents a set of facts

which could conceivably support FSI's claim that Dow possesses monopoly power

or has a dangerous probability of achieving monopoly power.  Dow's actions, if

true, substantiate the general allegations regarding Dow's manufacturing capacity,

sales volume, and leadership in setting prices.  Without a large manufacturing

capacity, sales volume, and the ability to influence, if not control, market prices for

MDI and polyols, Dow would not have been able to hold competitors like FSI

hostage with price increases and supply shortages, while offering FSI's customers

much more favorable terms.  In other words, Dow's alleged disparate treatment of

FSI as compared to the customers of FSI is the type of conduct that could only be

accomplished by a manufacturer that either possessed monopoly power or had a

substantial market share and thus a dangerous probability of achieving monopoly

power.  The facts, of course, may not support FSI's allegations or may provide

alternative explanations for the actions of both Dow and FSI.  Those competing

explanations, however, present factual issues that are not appropriately resolved in a

motion to dismiss.

### 3.    Anticompetitive Conduct

Monopolization and attempted monopolization claims brought pursuant to

section 2 of the Sherman Act must also allege anticompetitive conduct on the part of

the defendant.  Grinnell, 384 U.S. at 570-71; Conoco, Inc. v. Inman Oil Co., Inc.,

774 F.2d 895, 904 n. 6 (8th Cir. 1985) (reaffirming prior holdings that

anticompetitive conduct is a separate element of an attempted monopolization

claim). "To be labeled anticompetitive, the conduct involved must be such that its

'anticipated benefits were dependent upon its tendency to discipline or eliminate

competition and thereby enhance the firm's long term ability to reap the benefits of

monopoly power.'" Trace X Chem., Inc. v. Canadian Indus., Ltd., 738 F.2d 261,

266 (8th Cir. 1984) (quoting William Inglis & Sons Baking Co. v. ITT Continental

Baking Co., Inc., 668 F.2d 1014, 1030 (9th Cir. 1981)). In short, anticompetitive

conduct makes sense only because it eliminates competition. Conoco, Inc., 774

F.2d at 905 (citation omitted).

According to Dow, FSI's allegations do nothing more than demonstrate that

Dow exercised its right to choose with whom it would conduct business. Dow

maintains that it had no obligation to supply FSI with MDI and polyols, and thus

any failure on its part to supply FSI cannot constitute anticompetitive conduct.

Again, I disagree with Dow's characterization of the complaint.

FSI's allegations of anticompetitive conduct are summarized in paragraphs 38

and 39 of the complaint, which read:

> Among other actions, Dow has used its monopoly power in the
> Systems Market to intentionally and maliciously manipulate the supply
> and price of MDI and polyols available to FSI in a manner designed to

reduce or eliminate FSI's profits and FSI's ability to meet the needs of
its customers.

Among other actions, Dow has used the artificially exaggerated
shortages of MDI to steal customers and sales volume from FSI by
promising prospective customers a secure supply of MDI while stating
that Dow's policies ensured that FSI could not make a similar promise.

While Dow is correct that an individual manufacturer has considerable

freedom to choose with whom it conducts business, a party's refusal to deal is

actionable under the Sherman Act "[i]f accompanied by unlawful conduct or

agreement, or conceived in monopolistic purpose or market control." Times-

Picayune Pub. Co. v. United States, 345 U.S. 594, 625 (1953) (citation omitted).

The alleged unlawful conduct in this case – discriminatory price and supply

manipulations – closely resembles those cases in which suppliers used their market

power to eliminate competition from wholesale customers.  In City of Kirkwood v.

Union Electric Co., 671 F.2d 1173 (8th Cir. 1982), the plaintiff alleged that the

defendant utility company used its market power to raise wholesale electricity prices

above the retail rate paid by large industrial primary service customers.  The alleged

effect of this "price squeeze" was to prevent wholesale customers, including the

plaintiff, from competing with the utility in the retail market.  Id. at 1176 n.4.  The

Eighth Circuit recognized the plaintiff's price squeeze theory as a "claim cognizable

under the antitrust laws." Id. at 1182.

Similarly, in <u>Gen. Indus. Corp. v. Hartz Mountain Corp.</u>, 810 F.2d 795 (8th Cir. 1987), a pet supply manufacturer, Hartz, utilized its power over a distributor's credit terms to eliminate competition from that distributor in the retail market. The distributor alleged that Hartz responded to the plaintiff's marketing of competing products by withdrawing the credit it had traditionally extended to the plaintiff, terminating the plaintiff's distributorship, and blitzing the market with Hartz personnel from other areas in an attempt to draw away all the plaintiff's retail customers. <u>Id.</u> at 799-800. The Eighth Circuit upheld the jury award in favor of the plaintiff, reasoning that "the jury was entitled to conclude that Hartz's abrupt withdrawal of credit terms which had been established through the parties' dealings over the course of several years had no legitimate business purpose but made sense only if it was for the express purpose of stifling competition." <u>Id.</u> at 804.

Construing the allegations in a light most favorable to FSI, Dow's alleged manipulation of the price and supply of MDI and polyols is similar to the price squeeze in <u>Kirkwood</u> and the withdrawal of the plaintiff's credit line in <u>Hartz</u>. In all three instances, the defendants' actions could be reasonably viewed as having no legitimate business purpose except to stifle competition. In this case, Dow's selective application of price hikes and supply shortages to the detriment of a competitor and to the benefit of that competitor's customers suggests that Dow

20

"was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rivals." <u>Aspen Skiing Co. v. Aspen Highlands Skiing Corp.</u>, 472 U.S. 585, 610-11 (1985).

### 4.  Antitrust Injury

Dow contends that FSI's antitrust claims must fail because FSI has failed to allege that it suffered an antitrust injury.  A plaintiff does not have standing to sue under the antitrust laws unless he or she has suffered an antitrust injury.  <u>Lovett</u>, 975 F.2d at 520.  Mindful of the fact that antitrust laws "were enacted for 'the protection of competition, not competitors,'" the Supreme Court has defined antitrust injury as:

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.  The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.  It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'

<u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 488-89 (1977) (citations omitted).  The Court was careful to note that a plaintiff need not prove "an actual lessening of competition in order to recover ... [and] may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened." <u>Id.</u> at 698 n. 14.

Dow's primary contention is that FSI has only alleged injury to itself, as

opposed to injury to consumers or competition. Dow relies on <u>Razorback Ready</u>
<u>Mix Concrete Co., Inc. v. Weaver</u>, 761 F.2d 484 (8th Cir. 1985), a case in which
the Eighth Circuit reversed a denial of a motion to dismiss on the ground that the
plaintiff had failed to sufficiently allege an antitrust injury. In that case, the
defendants allegedly filed a "sham" lawsuit in an effort to thwart the sale of the
plaintiff's concrete company through the issuance of certain tax-exempt industrial
development revenue bonds. The defendants, all competitors of the plaintiff,
succeeded in preventing the issuance of the bonds, thus forcing the plaintiff into
bankruptcy. <u>Id.</u> at 486. The Eighth Circuit rejected the plaintiff's attempt to define
its antitrust injury as the denial of benefits that would have accrued from the
county's issuance of industrial revenue bonds. The Court reasoned as follows:

> The amended complaint does not include an allegation of the relevant
> market or of any actual anticompetitive effects within the relevant
> market. [Plaintiff] does not even allege that it has been eliminated as a
> competitor; to the contrary, it appears to be conceded that [plaintiff's]
> ready-mix concrete business (although under different ownership)
> remains a going concern. Accordingly, because [plaintiff] failed to
> allege in its amended complaint that defendants' conduct had any
> adverse effect on competition, defendants are entitled to dismissal of
> [plaintiff's] amended complaint for failure to state a cognizable claim
> under § 1 of the Sherman Act.

<u>Id.</u> at 488.

The allegations in this case present a sharp contrast to those in <u>Razorback</u>.

Unlike the plaintiff in that case, FSI has not simply alleged that it was deprived of a "substantial boon from local government." Id. at 487. Instead, FSI's injuries – lost customers and sales volume – exemplify the adverse effect on competition that Dow's price and supply "squeeze" was allegedly designed to achieve. See Midwest Communications, Inc. v. Minnesota Twins, Inc., 779 F.2d 444, 451 (8th Cir. 1985) ("To have standing to sue under the antitrust laws, the plaintiff must be the target of the anticompetitive activity, 'not one who has merely suffered indirect, secondary, or remote injury....'") (citation omitted). Accepting FSI's allegations as true, Dow's selective price and supply scheme was designed to freeze systems houses like FSI while Dow lured away the customers of these smaller competitors with guarantees that supply shortages would not apply if they purchased their MDI and polyols directly from Dow. See Minnesota Mining and Manufacturing Co. v. Appleton Papers, Inc., 35 F.Supp.2d 1138, 1147 (D. Minn. 1999) ("Courts have consistently held that competitors frozen out by exclusive dealing arrangements have suffered an antitrust injury and possess antitrust standing to sue for redress of this injury.") (citations omitted). FSI's allegations can be reasonably construed to claim that once FSI and other systems houses had lost a sufficient number of customers and sales volume, Dow would remain as consumers' only source of MDI and polyols in North America. This, of course, is precisely the type of harm from which consumers were

intended to be protected by the federal antitrust laws.

In sum, after a thorough review of Dow's challenges to FSI's antitrust claims, I find that FSI has adequately pled facts which could conceivably entitle it to relief under Section 2 of the Sherman Act. Accordingly, I will deny Dow's motion to dismiss the first two counts of FSI's complaint.

## B.     Breach of Contract Claims

In Counts III and IV of its complaint, FSI alleges that Dow breached the parties' August 16, 2004 written contract and their subsequent January, 2005 oral contract by failing to supply FSI with certain quantities of MDI and polyols during the 2004 and 2005 calendar years, and by failing to allocate MDI in a "fair and reasonable" manner during the period of time in which Dow claimed MDI was in short supply. Dow claims both of these counts must be dismissed for FSI's failure to comply with the applicable statute of frauds.[2]

Because both of the alleged contracts concern the sale of goods valued at well over five hundred dollars, the applicable statute of frauds lies in the Uniform Commercial Code, adopted in Missouri as Mo. Rev. Stat. § 400.2-201(1).[3] The

---

[2] As both parties have attached documents outside the pleadings, I will consider them, and will apply the summary judgment standard to the breach of contract claims. The result I reach would be the same, in any event.

[3] Although section 13(e) of the parties' August 16, 2004 agreement provides that Michigan law shall govern the contract, both Michigan and Missouri have adopted the provisions of the

main provision of this statute reads as follows:

> Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action of defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

Id.

## 1.    The August 16, 2004 Contract

The complaint alleges that FSI had "contracted with Dow in long term contracts," and later alleges that on August 16, 2004, they "reaffirmed" their contract. The complaint did not attach a copy of the alleged contract. Dow attached to its motion to dismiss a copy of an unsigned draft, and asserts that is the contract alleged, but says it was never executed. FSI then provided a copy of the same document, which FSI says it had signed and sent back to Dow, and asserts that a contract was formed even though Dow did not sign it.

Mo. Rev. Stat. § 400.2-201(1) clearly provides that a contract for the sale of goods must be "signed by the party against whom enforcement is sought." Subsection 2 of Mo. Rev. Stat. § 400.2-201, however, provides an exception to the signature requirement of § 400.2-201(1) if the contract at issue is between

Uniform Commercial Code that are applicable in this case, so I need not decide the choice of law issue at this time.

merchants.  Mo. Rev. Stat. § 400.2-201(2) provides:

> Between merchants if within a reasonable time a writing in
> confirmation of the contract and sufficient against the sender is
> received and the party receiving it has reason to know of its contents, it
> satisfies the requirements of subsection (1) against such party unless
> written notice of objection to its contents is given within ten days after
> it is received.

From the face of the complaint, it appears that both Dow and FSI could be considered merchants.  That is, they both are entities that deal in goods (MDI and polyols) of the kind involved in the alleged agreement.  <u>See</u> Mo. Rev. Stat. § 400.2-104(1) (defining "merchant" as "a person who deals in goods of the kind ... involved in the transaction").  Although neither party has addressed this issue, I cannot say that the merchant exception does not apply, or that Dow is entitled to judgment as a matter of law for some other reason.  A factual dispute exists regarding whether a contract exists.  FSI's complaint is sufficient to go forward at this time.

## 2.     The January, 2005 Contract

Dow claims that count IV of FSI's complaint must also be dismissed because the alleged January, 2005 oral contract fails to satisfy the statute of frauds writing requirement.  I agree.  Mo. Rev. Stat. § 400.2-201(1) provides that contracts for the sale of goods are not enforceable "unless there is some writing sufficient to indicate

that a contract for sale has been made between the parties." Courts have consistently held that a plaintiff's failure to satisfy this statute's writing requirement is grounds for dismissal under Rule 12(b)(6). See, e.g., Casazza v. Kiser, 313 F.3d 414, 420 (8th Cir. 2002) (dismissing the complaint on account of plaintiff's failure to produce any document that satisfied the statute of frauds' writing requirement). FSI attempts to circumvent the absence of a writing by arguing that the 2005 contract was a modification of the August 16, 2004 written contract. It also argues that the doctrine of partial performance takes the case out of the statute of frauds.

If a contract was required to be in writing, any modification must also be in writing. Mo. Rev. Stat. § 400.2-209(3) expressly provides that "[t]he requirements of the statute of frauds section of this article (section 400.2-201) must be satisfied if the contract as modified is within its provisions." The U.C.C. states that "[a] signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party." Mo. Rev. Stat. § 400.2-209(2). As the accompanying comments further explain, this section allows parties to "make their own Statute of Frauds as regards [to] any future modification of the contract by giving effect to a clause in a signed agreement which expressly requires any modification to be by signed

writing." <u>Id.</u> at cmt. 3.

In this case, the written agreement that FSI signed on August 16, 2004 and attached to its reply brief explicitly states that "[t]his document may be modified only by a written amendment, expressly stated as such, signed by both parties." Thus, even assuming that a written contract existed in 2004, any modification in January, 2005 was required to be in writing.

Finally, FSI's attempt to excuse the statute of frauds' writing requirement under the doctrine of partial performance must also fail. Mo. Rev. Stat. § 400.2-201(3)(c) permits enforcement of contracts that fail to satisfy the statute of frauds "with respect to goods for which payment has been made and accepted or which have been received and accepted." Thus, the doctrine of partial performance "can validate the contract only for the goods which have been accepted or for which payment has been made and accepted." <u>Id.</u> at cmt. 3.

In this case, FSI's breach of contract action seeks damages for the quantities of MDI and polyols that were never received. Accordingly, the statute of frauds applies and FSI cannot bring an action on the alleged oral contract.

## C. Tortious Interference

In Count V of the complaint, FSI alleges that Dow tortiously interfered with FSI's business expectancy with Phillips Products by luring Phillips' business away

from FSI during the fabricated supply shortage. Under Missouri law, the claim of tortious interference consists of the following five elements:

> (1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct.

Community Title v. Roosevelt Federal Savings & Loan, 796 S.W.2d 369, 372 (Mo. 1990) (en banc).

Dow argues that the complaint fails to demonstrate how Dow's acts of interference with the Phillips expectancy were unjustified. It argues that FSI has alleged nothing more than normal competition. In Conoco, the Eighth Circuit held that intentional interference with the prospective contractual relations of a competitor is not improper if:

> (a) the relation concerns a matter involved in the competition between the actor and the other, and
> (b) the actor does not employ wrongful means, and
> (c) his action does not create or continue an unlawful restraint of trade, and
> (d) his purpose is at least in part to advance his interest in competing with the other.

774 F.2d at 907 (quoting Restatement (Second) of Torts § 768).

"Wrongful means" are "means which are intrinsically wrongful – that is, conduct which is itself capable of forming the basis for liability of the actor." Id.

29

Examples of "wrongful means" include "physical violence, misrepresentations, threats or prosecution of civil or criminal suits, and <u>unlawful conduct such as antitrust violations</u>." <u>Id.</u> (emphasis added).

For reasons more fully discussed above, the conduct that forms the basis of FSI's tortious interference claim is the same anticompetitive conduct that underlies its monopolization and attempted monopolization claims. Thus, by stating a claim for monopolization and attempted monopolization, FSI has alleged that Dow's acts of interference were "intrinsically wrongful" and thus unjustified. For these reasons, Dow's motion to dismiss FSI's tortious interference claim must fail.

### D. Fraudulent Misrepresentation

FSI alleges that Dow made several fraudulent misrepresentations in its November 17, 2004 letter to FSI. In particular, FSI cites Dow's claimed shortage of MDI as well as its stated intention to address the shortage in a fair and reasonable manner. FSI maintains that both these statements were false, and were ploys used to hobble FSI while Dow lured away FSI's MDI and polyols customers. Even assuming both these statements were false, Dow contends that FSI has failed to sufficiently plead the elements of fraud in accordance with the heightened pleading standards of Rule 9(b), Fed. R. Civ. P.

The elements of fraudulent misrepresentation in Missouri are as follows:

> (1) a false, material representation; (2) the speaker's knowledge of its falsity or his ignorance of its truth; (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated; (4) the hearer's ignorance of the falsity of the representation; (5) the hearer's reliance on its truth; (6) the hearer's right to rely thereon; and (7) the hearer's consequent and proximately caused damages.

Mprove v. KLT Telecom, Inc., 135 S.W.3d 481, 489-90 (Mo. Ct. App. 2004).

Under Rule 9(b), "the circumstances constituting fraud ... shall be stated with particularity." Put another way, "[w]hen pleading fraud, a plaintiff cannot simply make conclusory allegations." Roberts v. Francis, 128 F.3d 647, 651 (8th Cir. 1997) (citation omitted). To determine whether the requirements of Rule 9(b) have been satisfied, a court should examine the pleadings for allegations concerning "the time, place, and contents of the alleged fraud; the identity of the person allegedly committing fraud; and what was given up or obtained by the alleged fraud." Id. (citation omitted). A plaintiff must not necessarily plead all of these factors under Rule 9(b), but must plead "enough so that his/her pleadings are not merely conclusory." Id. at n. 5. In sum, "[t]he special nature of fraud does not necessitate anything other than notice of the claim; it simply necessitates a higher degree of notice, enabling the defendant to respond specifically, at an early stage in the case, to potentially damaging allegations of immoral and criminal conduct." Abels v. Farmers Commodities Corp., 259 F.3d 910, 920 (8th Cir. 2001).

After reviewing the complaint under these standards, I find that FSI has stated a claim for fraudulent misrepresentation with sufficient particularity to satisfy the heightened pleading requirements of Rule 9(b).  The complaint identifies the allegedly fraudulent statements: Dow's supply shortage and its use of all commercially reasonable means to address the shortage in a fair and reasonable manner.  It identifies the source and the timing of the statements: a November 17, 2004 letter from Dow to FSI.  Further, it alleges that in January of 2005 FSI renegotiated the terms of the parties' contract in reliance on Dow's claimed supply shortage.  Finally, the complaint alleges that by falsely assuring FSI that supplies were low and the remaining stocks would be allocated in a fair and reasonable manner, Dow was able to maneuver past FSI and secure the customers and sales volume that FSI had previously maintained, thus causing damage to FSI.  For these reasons, I conclude that the complaint sufficiently places Dow on notice of the claims against it and enables it to respond specifically to the allegations of fraud.  Accordingly, Dow's motion to dismiss Count VI fails.

**E.      Fraudulent Misappropriation of Trade Secrets**

In Count VII of the complaint, FSI alleges that it shared several trade secrets with Dow in the course of negotiations for a technology-sharing agreement.  FSI maintains that Dow induced FSI to share its trade secrets by assuring FSI "that it

was negotiating the technology-sharing agreement in good faith and with the intention of reaching a final contract." According to FSI, these assurances were false, and Dow subsequently broke off the negotiations and began using the trade secrets that it had acquired from FSI.

Under the Missouri Uniform Trade Secrets Act, a plaintiff may obtain an injunction or seek damages for the misappropriation of trade secrets. Mo. Rev. Stat. §§ 417.455, 417.457. "Misappropriation" is defined, among other acts, as the "[a]cquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means." Mo. Rev. Stat. § 417.453(2)(a). Examples of "improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Mo. Rev. Stat. § 417.453(1).

While trade secret claims are typically governed by Rule 8 notice pleading requirements, SL Montevideo Technology v. Eaton Aerospace, L.L.C., 292 F.Supp.2d 1173, 1179 (D. Minn. 2003), Rule 9(b) is clear that "all averments of fraud or mistake ... shall be stated with particularity." See Brege v. Lakes Shipping Co., Inc., 225 F.R.D. 546, 549 (E.D. Mich. 2004) ("[I]f an allegation in a pleading contains 'an averment of fraud,' whether as part of a fraud claim or an element of a non-fraud claim, the 'averment of fraud' must be stated with particularity."). Thus,

where a plaintiff alleges fraud as the improper means by which a party misappropriated trade secrets, Rule 9(b)'s particularity requirement applies.

As is clear from the title of Count VII of the complaint as well as from the allegations listed under Count VII, FSI contends that Dow misappropriated trade secrets through fraud and misrepresentation.  In its brief, FSI advances an alternative theory, claiming that Dow misappropriated FSI's trade secrets by breaching the parties' confidentiality agreement.  While this may be a viable theory, it is not the theory that was pled in the complaint. See Car Carriers, 745 F.2d 1101, 1107 (7th Cir. 1984) ("the complaint may not be amended by the briefs in opposition to a motion to dismiss") (citations omitted); TV Communications Network, 964 F.2d at 1025 (rejecting the plaintiff's attempt to re-characterize the allegations in the complaint and holding that a complaint "must stand or fall on its own").  The misappropriation alleged in Count VII of the complaint is premised solely on fraudulent statements Dow allegedly made to FSI in order to induce FSI to share its trade secrets.  Accordingly, FSI's misappropriation claim must stand or fall on the sufficiency of its allegations of fraud.

In order to satisfy Rule 9(b)'s particularity requirement, "the complaint must identify the 'who, what, where, when, and how' of the alleged fraud."  United States ex rel. Joshi v. St. Luke's Hosp., Inc., 441 F.3d 552, 556 (8th Cir. 2006)

(citations omitted).  FSI's allegations of fraud fail to meet this standard, as they do not specify which Dow employees or representatives made the false statements, when the statements were made, or the means by which they were communicated. In sum, these allegations fail to allow Dow to respond specifically to these potentially damaging claims.  See Abels, 259 F.3d at 920.  Accordingly, Count VII of the complaint must be dismissed.

## F.    Unjust Enrichment

The final count of the complaint seeks damages for Dow's alleged misappropriation of FSI's trade secrets under the theory of unjust enrichment.  By its own terms, the Missouri Uniform Trade Secrets Act "displace[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret."  Mo. Rev. Stat. § 417.463(1).  Thus, "civil claims that are derivative of a claim of misappropriation of trade secrets are preempted."  Bancorp Services, L.L.C. v. Hartford Life Ins. Co., No. 4:00-CV-70CEJ, 2002 WL 32727076 at *4 (E.D. Mo. Feb. 25, 2002).  In this case, it is clear that Count VIII derives from Dow's theft, or misappropriation, of FSI's proprietary processes and trade secrets.  Under Missouri law, FSI's sole avenue for legal recourse lies in Missouri's Uniform Trade Secrets Act.   Accordingly, Count VIII is dismissed.

## Conclusion

For the reasons set forth above, I will grant Dow's motion to dismiss in part, and will dismiss FSI's claims of breach of the January 2005 oral contract (Count IV), fraudulent misappropriation of trade secrets (Count VII), and unjust enrichment (Count VIII). Dow's motion is denied as is applies to FSI's claims of monopolization (Count I), attempted monopolization (Count II), breach of the August 16, 2004 contract (Count III), tortious interference (Count V), and fraudulent misrepresentation (Count VI).

Accordingly,

**IT IS HEREBY ORDERED** that defendant The Dow Chemical Company's motion to dismiss [# 4] is granted as to Counts IV, VII, and VIII of plaintiff Foam Supplies, Inc.'s complaint and denied as to Counts I, II, III, V, and VI of the complaint.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of August, 2006.